IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| WACHOVIA INSURANCE SERVICES, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | CIVIL NO.: WDQ-07-2114 |
| v. | * | |
| PENNIE HINDS, MICHAEL BARSOUM, AND HILB, ROGAL AND HOBBS COMPANY | * | |
| | * | |
| Defendants. | * | |
| | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Wachovia Insurance Services, Inc. ("Wachovia") seeks a preliminary injunction against Pennie Hinds, Michael Barsoum, and Hilb, Rogal and Hobbs Company ("HRH") for breaches of restrictive covenants.  For the following reasons, a preliminary injunction was granted.

I.   Background

Hinds was hired by Palmer & Cay ("Palmer"), an insurance brokerage firm, as an employee insurance benefits consultant on January 1, 1999.  Affidavit of Pennie Hinds, ¶ 7.  On February 13, 2004, Hinds signed a Nonpiracy, Nonsolicitation, and Nondisclosure Agreement in connection with a shareholder's agreement with Palmer ("Hinds Agreement").  *Id.* ¶ 8.  The agreement provides that Hinds would not solicit or pirate Palmer

customers, nor disclose confidential information about them, for 2 years after her employment with Palmer ended.[1]

Barsoum was hired by Palmer as an employee benefits consultant on April 8, 2002.  Affidavit of Michael Barsoum, ¶ 5. On March 26, 2002, Barsoum signed a Nonpiracy, Nonsolicitation,

---

[1] The Hinds Agreement provides:

1. <u>Nonpiracy and Nonsolicitation</u>. Shareholder agrees that for so long as Shareholder is an employee of the Company, and for a period of (2) years thereafter, Shareholder will not, directly or indirectly, except on behalf of the Company:

(a) solicit, divert, or take away, or attempt to solicit, divert or take away (i) any Business of any of the customers of the Company which Shareholder contacted or with which Shareholder dealt as a representative of the Company during the last two (2) years of being an employee of the Company and/or about which Shareholder has Confidential Information ("Covered Customers"), or (ii) any prospective customers of the Company which Shareholder solicited for the Company within one (1) year prior to Shareholder's last day as an employee of the Company and regarding which Shareholder had Confidential Information ("Covered Prospects"), with respect to any product or service in competition with the Company's products or services ("Competitive Products/Services");

(b) cause or attempt to cause any of the Covered Customers or Covered Prospects of the Company to refrain from maintaining or acquiring from or through the Company any Business product or service provided or offered by the Company; . . .

. . . .

2. <u>Nondisclosure</u>. . . . Shareholder agrees that for so long as Shareholder is an employee of the company, and for a period of two (2) years thereafter, Shareholder will not use, divulge, disclose or make accessible to any person or entity . . . Confidential information of and with respect to the Company, and/or of third parties with which Company has obligations of confidentiality. . . .

Pl.'s Supp. Mem. Ex. 1, Tab A at 2-3.

and Nondisclosure Agreement in connection with an employee's agreement with Palmer ("Barsoum Agreement"). *Id.* ¶ 7. The agreement provides that Barsoum would not pirate or solicit Palmer customers, nor disclose confidential information about them, for 18 months after his employment with Palmer terminated.[2]

---

[2] The Barsoum Agreement provides:

1. Nonpiracy and Nonsolicitation Agreement

(a) . . . Employee hereby covenants and agrees that during the entire period of [his] employment with the Company and for an additional period extending for eighteen (18) months after [his] termination of employment, whether voluntary or involuntary:

> (i) The Employee will not, directly or indirectly, solicit, divert, procure or take away, or attempt to solicit, divert[,] procure or take away, the insurance or employee benefit plan business of any of the customers of the Company which were served by the Employee or for which the Employee rendered any significant services during the term of [his] employment with the Company, or any prospective customers of the Company which the Employee solicited for the Company within one year prior to [his] termination of employment, for the purpose of selling to or servicing for any such customer or prospective customer any insurance or employee benefit product or service which is competitive with any product or service offered by the Company during his employment; and

> (ii) The Employee will not, directly or indirectly, cause or attempt to cause any of the foregoing customers or prospective customers of the Company to refrain from maintaining or acquiring from or through the Company any insurance or employee benefit plan product or service which was provided or offered by the Company during [his] employment, or otherwise induce such customers or prospective customers to reduce, terminate, or restrict or alter their business relationships with the Company in any fashion, and Employee will not assist, directly or indirectly, any other person or persons to do so.

In May 2005, Wachovia acquired Palmer and retained Hinds and Barsoum.  Compl. ¶¶ 24, 29.  On July 13, 2007, Hinds and Barsoum resigned.  Affidavit of Tim Meacham, Managing Director of Wachovia for the Chesapeake Partnership, ¶¶ 28-29.  Hinds's resignation was effective immediately; Barsoum's resignation was effective as of July 27, 2007.  *Id.*  Hinds began employment at HRH on July 16, 2007, Hinds Aff. ¶ 14, and Barsoum began working at HRH on July 30, 2007.  Barsoum Aff. ¶ 3.

Since the resignations of Hinds and Brown, four clients have left Wachovia and moved to HRH: (1) KCI Technologies ("KCI"); (2) University Physicians, Inc. ("UPI"); (3) the Atlanta Law Firm Consortium (Smith, Gambrell & Russell LLP; McKenna Long & Aldridge LLP; and Arnall Golden Gregory LLP); and (4) Arent Fox

--------

. . . .

3. <u>Nondisclosure Agreement</u>. . . . Employee hereby agrees that, during the period of [his] employment with the Company and after [his] termination of employment, whether voluntary or involuntary, for a period of eighteen (18) months, the Employee will not divulge, disclose or make accessible to any person or entity . . . the following confidential business information of and with respect to the Company and/or an Affiliate, regardless of whether such information is written or not: market plans; compensation information concerning any employee; profit and loss and expense figures; pricing structure for any product or service; the names of customers; non-public information of any nature whatsoever regarding or contained in accounts of customers; and any other information which the Company or an Affiliate may from time to time designate and treat as confidential business information. . . .

Pl.'s Supp. Mem. Ex. 1, Tab B at 2-3.

LLP.  Meacham Aff. ¶ 52; Hinds Aff. ¶ 23; Prelim. Inj. Hr'g Tr.
12, Aug. 23, 2007.  Additionally, members of the DC Law Firm
Consortium (Dow Lohnes PLLC; Finnegan Henderson Farabow Garrett &
Dunner LLP; Patton Boggs LLP; Steptoe & Johnson LLP; and Wiley
Rein LLP) have indicated their interest in moving from Wachovia
to HRH.  Meacham Aff. ¶ 43.  Hinds and Barsoum worked with these
customers while employed at Wachovia.  Pl.'s Supp. Mem. at 7-8.

On August 9, 2007, Wachovia filed a Complaint and a Motion
for a temporary restraining order ("TRO") and Preliminary
Injunction against Defendants.  Paper Nos. 1, 2.  That day, Judge
J. Frederick Motz held an emergency hearing and granted
Wachovia's motion for a TRO.  Paper No. 5.  The TRO restrained
and enjoined Hinds and Barsoum from making any presentations or
communications to Wachovia clients with whom Hinds or Barsoum had
contact while employed at Wachovia.  *Id.*  It also restrained HRH
from aiding or encouraging Hinds or Barsoum in this activity.
*Id.*  On August 23, 2007, the Court held a hearing on Wachovia's
motion.[3]

II.  Discussion

A.  Temporary Restraining Order

Federal Rule of Civil Procedure 65(b) authorizes a TRO without
notice to the opposing party if the applicant provides: (1) proof
of irreparable injury; and (2) a certified statement of efforts

---

[3] On August 24, 2007, the Court entered a preliminary
injunction order against Defendants.  Paper No. 16.

made at contacting the opposing party.  Fed. R. Civ. P. 65(b).

Although Rule 65(b) does not define sufficient notice, it does

provide that practical notice should be given.  *Ciena Corp. v.*

*Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000).  If notice is deemed

insufficient and a TRO is issued, the opposing party may move for

dissolution or modification of the order.  Fed. R. Civ. P. 65(b).

On August 16, 2007, Defendants filed a motion to dissolve the

TRO, alleging that they had not received adequate notice of the

August 9 hearing.  Paper No. 11; Def.'s Supp. Mem. at 11-12.

Wachovia replied to Defendants' motion that day, providing faxes,

letters, and e-mail exchanges indicating that the Defendants had

notice of the hearing.  Pl.'s Opp'n Mot. Exs. 1-5.

Although Wachovia did not serve the Complaint and the TRO motion

on Defendants, it provided sufficient notice under Rule 65(b).

Wachovia faxed letters to Defendants on August 6, 2007,

indicating Wachovia's intention to file a complaint and a motion

for injunctive relief.  *Id.*, Ex. 2.  After Defendants failed to

reply that day, Wachovia faxed another letter indicating that the

complaint and TRO motion would be filed on August 9, 2007 at 10

a.m.  *Id.*, Ex. 1.  On August 8, 2007, Defendants replied, raising

legal arguments indicating that neither Hinds nor Barsoum had

violated the restrictive covenants.  *Id.*, Ex. 3.  That Defendants

did not receive Wachovia's Complaint and motion for a TRO until

the following day does not mean that Defendants received

insufficient notice.  *See Hoechst Diafoil Co. v. Nan Ya Plastics*

*Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (distinguishing between the formal notice required for preliminary injunctions and the lesser notice required for TROs).  Accordingly, Defendants' motion to dissolve the TRO will be denied.

B.   Preliminary Injunction

1.   Standard of Review

In determining whether to grant a preliminary injunction, a court must consider: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest.  *Ciena*, 203 F.3d at 322; *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193-95 (4th Cir. 1977).

In considering those factors, "the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant."  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002).  The degree of harm suffered by the plaintiff and defendant are the most important factors.  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).  "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the

merits so serious, substantial, difficult and doubtful, as to
make them fair ground for litigation and thus for more deliberate
investigation.'" *Rum Creek Coal Sales, Inc. v. Caperton*, 926
F.2d 353, 359 (4th Cir. 1991) (internal citations omitted)
(*quoting Blackwelder*, 550 F.2d at 195).  But if the balance tips
away from the plaintiff, a greater likelihood of success on the
merits is required.  *Id.*

2.   The Likelihood of Irreparable Harm to Wachovia

     Irreparable harm is suffered when monetary damages are
inadequate and a legal remedy provides the only relief.  *See*
*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d
691, 694 (4th Cir. 1994).  Thus, "when the failure to grant
preliminary relief creates the possibility of permanent loss of
customers to a competitor or the loss of goodwill, the
irreparable injury prong is satisfied."  *Multi-Channel TV Cable*
*Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546,
552 (4th Cir. 1994) (*citing Merrill Lynch, Pierce, Fenner and*
*Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)).

     Wachovia claims that it will suffer irreparable harm because
four clients have already left for Hinds and Barsoum at HRH and
others may follow.  Pl.'s Supp. Mem. at 16; Hr'g Tr. 12.  KCI,
UPI, the Atlanta Law Firm Consortium, and Arent Fox have left
Wachovia, taking approximately $425,000 in estimated annual
revenues.  Meacham Aff. ¶¶ 22-23.  Moreover, Wachovia contends
that the DC Law Firm Consortium, with estimated annual revenues

of $232,000, may also move to Hinds and Barsoum at HRH.  Compl. ¶
62; Meacham Aff. ¶ 22.  Wachovia contends that Maryland law
supports its position,[4] and cites Hinds's and Barsoum's close
personal contacts with clients, access to insider information,
and loss of customer goodwill as its rationale for pursuing an
equitable remedy.  Pl.'s Supp. Mem. at 16-17.  Defendants have
not diminished Wachovia's claim that it will suffer irreparable
harm.

Irreparable harm must be "neither remote nor speculative,
but actual and imminent."  *Direx*, 952 F.2d at 812 (internal
quotation marks omitted) (*quoting Tucker Anthony Realty Corp. v.
Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  Wachovia has
demonstrated a probability that it would lose customers to HRH
absent injunctive relief.  On August 1, 2007, the DC Law Firm
Consortium met with Wachovia and HRH, inquiring why the
Consortium should stay with Wachovia and not move to HRH.  Pl.'s
Supp. Mem. Ex. 1, Tab F.  Hinds has solicited and received
letters from all the members of the Consortium indicating their
interest in HRH's services.  Def.'s Supp. Mem. Ex. 1, Tab D.  The

---

[4] Although the Barsoum Agreement is governed by North
Carolina law, Pl.'s Supp. Mem. Ex. 1, Tab B at 5, neither party
disputes that Maryland law applies to his employment agreement.
Pl.'s Supp. Mem. at 21 n.3; Def.'s Supp. Mem. at 14.
     At the hearing, Defendants contended that Hinds had signed
an earlier agreement which was governed by Georgia law.  Hr'g Tr.
159:1-17.  Defendants did not provide this document in their
Motion to Dissolve or at the hearing.  Thus, the Court will only
consider the agreement appended by both parties in their motions,
which provided that Maryland law would govern the Hinds
Agreement.  Pl.'s Supp. Mem. Ex. 1, Tab A at 5.

imminent departure of a major client such as the DC Law Firm
Consortium demonstrates irreparable harm.

Wachovia also argues that it is in jeopardy of losing the
State of Delaware as a client and that Hinds has the capacity to
misuse Wachovia's proprietary pricing information.  The State of
Delaware has been a Wachovia client since 2005, when Palmer
merged with Wachovia.  Hr'g Tr. 100:20-101:23.  In July 2007,
Delaware issued a public Request for Proposal ("RFP") for
consulting work related to its state insurance and benefits
programs.  Pl.'s Supp. Mem. at 10.  Before her termination, Hinds
worked with a Wachovia team to produce a response to the bid.
*Id.*  The prepared response included financial pricing information
that differentiated Wachovia from competing bidders.  *Id.*  Once
Hinds became an HRH employee, she prepared a bid for the RFP on
behalf of HRH.  Hr'g Tr. 63:13-16.  On August 9, 2007, Delaware
pulled the RFP, and submitted a new RFP on August 23, 2007.  *Id.*
at 15-16.

Hinds contended at the hearing that neither she nor HRH
played any part in Delaware suspending its RFP.  Hr'g Tr. 102:7-
8.  In her Motion to Dissolve, Hinds also states that the RFP is
a public process and that submitting a bid is not solicitation.
Def.'s Supp. Mem. at 8-9.  Therefore, Hinds argues that she and
HRH should be free to participate in this public process.

Wachovia's argument is not that Hinds solicited Delaware,
but that she may use proprietary and confidential pricing

information prepared by her at Wachovia to the advantage of HRH

in its upcoming bid.  Hr'g Tr. 16:15-17:13.  Meacham indicated

that this pricing information was marked confidential by Wachovia

in its bid, and that Delaware recognized its confidentiality.

*Id.* at 33:21-25.  Given that HRH is now directly competing with

Wachovia on the RFP, Hinds's access and knowledge of this pricing

information could irreparably harm Wachovia.  This imminent harm

satisfies the irreparable harm prong of the *Blackwelder* factors.

3.  The Likelihood of Harm to the Defendants

Wachovia contends that neither Hinds nor Barsoum will be

harmed by a preliminary injunction because they will still be

able to develop a customer base at HRH.  Pl.'s Supp. Mem. at 17.

Wachovia argues that the restrictive covenants only prohibit

Hinds and Barsoum from working with customers they served while

employed at Wachovia.  *Id.* at 18.  Wachovia also contends that

HRH will not be harmed by the injunction because there is a

difference in degree between Wachovia losing current customers

and HRH losing the ability to pursue Wachovia's customers.  *Id.*

Defendants did not produce any evidence that they would be harmed

by the injunction and did not present such evidence at the

hearing.

As Defendants have not countered Wachovia's claim of

irreparable harm or shown that they are likely to suffer harm,

the balancing of the harms tips decidedly in favor of Wachovia.

Accordingly, to succeed on its motion for a preliminary

injunction, Wachovia need not make a strong showing of likelihood of success on the merits. *Maryland Undercoating Co. v. Payne*, 603 F.2d 477, 481 (4th Cir. 1979).

4.   The Likelihood of Success on the Merits

a.   Breach of Contract Claim

Under Maryland law, to enforce a restrictive covenant, "(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (*citing Silver v. Goldberger*, 231 Md. 1, 6-8, 188 A.2d 155, 158-59 (Md. 1963)). "A covenant not to compete is enforceable if its duration and geographic area are only so broad as is reasonably necessary to protect the employer's business, and if the covenant does not impose undue hardships on the employee or the public." *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (*citing Holloway v. Faw, Casson & Co.*, 319 Md. 324, 334, 572 A.2d 510, 515 (Md. 1990)). Courts must look to the specific facts to determine whether the particular restraint is reasonable. *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123, 225 A.2d 288, 291 (Md. 1967).

Defendants focus primarily on the language of the covenants. The Hinds Agreement provides that she may not, for a period of

two years after termination, "directly or indirectly . . .
solicit, divert, or take away or attempt to solicit, divert or
take away" the business of (1) customers of Wachovia with whom
she "dealt" in the two years preceding termination of her
employment or (2) any prospective Wachovia customers that she
solicited in the past year preceding termination.  Pl.'s Supp.
Mem. Ex. 1, Tab A at 2.  The Hinds Agreement also states that
Hinds may not "directly or indirectly . . . cause or attempt to
cause" any such customers or prospective customers "to refrain
from maintaining or acquiring" any business from Wachovia.  *Id.*

    The Barsoum Agreement similarly provides that he may not,
for a period of eighteen months following termination, "directly
or indirectly, solicit, divert, procure or take away, or attempt
to solicit, divert[,] procure or take away" business of (1)
Wachovia customers he "served" or "rendered any significant
services" while employed there or (2) any prospective Wachovia
customers that he solicited in the past year preceding
termination.  Pl.'s Supp. Mem. Ex. 1, Tab B at 2.   The Agreement
adds that Barsoum may not "directly, or indirectly, cause or
attempt to cause" any such customers or prospective customers "to
refrain from maintaining or acquiring" any business from Wachovia
or "otherwise induce" them to "reduce, terminate, or restrict or
alter their business relationships" with Wachovia "in any
fashion."  *Id.*  Also, the Barsoum Agreement prohibits him from

13

"assist[ing], directly or indirectly, any other person or persons" in this activity. *Id.*

Defendants contend that the solicitation language requires some affirmative action on their part and does not include the acceptance of unsolicited business. Def.'s Supp. Mem. at 16-17. Defendants allege that Hinds and Barsoum did not actively engage in solicitation efforts, but that the Wachovia customers contacted them on their own volition. *Id.* at 17. Defendants also contend that the nonpiracy clause does not bar acceptance of unsolicited business. *Id.* at 20. Defendants argue that the phrase "cause or attempt to cause" in both agreements is ambiguous and would allow Wachovia to enforce conduct that is outside its legitimate business interest. *Id.* at 20-21. Defendants also contend that the phrases in the Barsoum Agreement are unreasonably ambiguous and leave him guessing at what activities are covered. *Id.* at 20. Wachovia does not address whether the language of the covenants is impermissibly vague, but rather contends that Hinds and Barsoum actively solicited their customers.

The Fourth Circuit, applying Maryland law, has agreed that the "plain meaning of 'solicit' requires the initiation of contact." *Mona Elec. Group, Inc. v. Truland Serv. Corp.*, 56 F. App'x 108, 110 (4th Cir. 2003) (per curiam). Wachovia has not presented evidence that Hinds initiated contact with any Wachovia

customers.  But that does not mean that Hinds and Barsoum did not solicit Wachovia clients.

To rebut this claim, Hinds presents letters from Wachovia customers indicating that she informed them of the agreement and that the customers contacted her without previous activity on her part.  Def.'s Supp. Mem. Ex. 1, Tab D.  At the hearing, Hinds admitted that the letters were not created by the clients, but were built from form language originating in the HRH legal department.  Hr'g Tr. 89:19-23.  Given their origins, the letters to Hinds may be viewed as proof of solicitation.

Hinds's communications with Arent Fox are indicative of solicitation.  On August 7, 2007, Hinds met with Arent Fox representatives to discuss HRH's services.  Hr'g Tr. 39.  At that meeting, Arent Fox received a presentation from HRH touting Hinds's past service with Arent Fox and her continued involvement with the Arent Fox account if HRH was selected.  *Id.* at 42-45. At the hearing, Hinds admitted that she added the language about her past service because she believed that Arent Fox wanted to continue to work with her.  *Id.* at 43:2-4.  On August 9, 2007, Arent Fox became a client of HRH.  *Id.* at 52.

Even if Hinds did not initiate contact with Arent Fox, she may have actively solicited them to move from Wachovia to HRH. She referenced her past service at Wachovia to help HRH secure Arent Fox as a client.  Waiting for clients to call and then actively trading on the services provided by a previous employer

do not remove Hinds's activity from the scope of the nonsolicitation agreement.

Hinds and Barsoum also may have violated the nonpiracy clauses of their agreements.  Webster's defines "cause" as "anything producing an effect or result" or "a person or thing acting voluntarily or involuntarily as the agent that brings about an effect or result."  Webster's New World Dictionary 223 (3d ed. 1988).  Defendants may well have "caused" Wachovia customers to migrate to HRH.  After Hinds and Barsoum left Wachovia, customers with whom they worked at Wachovia moved their business to HRH.  The letters to Hinds and Barsoum indicate that the customers' interest in HRH was predicated on Hinds's and Barsoum's employment there.

(1)  Legally Protected Interest

Employers "have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers."  *Holloway*, 319 Md. at 335, 572 A.2d at 515.  Indeed, "[r]estrictive covenants almost always serve a legitimate employer interest when they restrict former salespersons who serviced, solicited, and were in constant contact with customers."  *Deutsche Post*, 116 F. App'x at 438 (*citing Silver*, 231 Md. at 6, 188 A.2d at 188).  Hinds and Barsoum had access to proprietary client information and were responsible for maintaining, soliciting, and developing client relationships at Wachovia.  Meacham Aff. ¶¶ 8-10.  Accordingly,

the Court concludes that Wachovia had a legally protected interest in preventing Hinds and Barsoum from using these relationships to bring new business to HRH.

(2)  Reasonableness

The reasonableness of the scope and duration "must be made based on the scope of each particular covenant itself; and, if that is not too broad on its face, the facts and circumstances of each case must be examined." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835, 838 (Md. 1973).  The parties do not contest the duration of the covenant or the lack of a geographic restriction. Rather, Defendants contend that the nonpiracy agreement prevents Hinds and Barsoum from engaging in any kind of competition with Wachovia at all.  Def.'s Supp. Mem. at 23.  Wachovia counters that the prohibition only extends to Wachovia customers for whom Hinds and Barsoum provided services or who they solicited.  Pl.'s Supp. Mem. at 22.

The nonpiracy clauses are not as sweeping as Defendants contend.  It does not prohibit "any" activity that might adversely impact the interests of Wachovia, *see Deutsche Post*, 116 F. App'x at 438, but rather confines the prohibited conduct to customers with whom Hinds and Barsoum worked and developed goodwill on behalf of Wachovia.  The Court will not read the nonpiracy clause to include the type of speculative and unlikely hypotheticals proposed by Defendants.  Def.'s Supp. Mem. at 22. As the provision is not aimed at merely restricting competition,

but at preserving Wachovia's goodwill, the Court finds that the
nonpiracy clause is reasonable.

(3)  Undue Hardship

Defendants do not specify the hardship they will suffer if
the agreements are enforced.  They do not contend that they will
be forced to relocate or find new employment.  Indeed, Hinds and
Barsoum are free to work with any of HRH's clients; they just
cannot cause Wachovia customers with whom they worked to move to
HRH.  Accordingly, the agreements as applied to Hinds and Barsoum
do not pose an undue hardship.

(4)  Public Policy

Defendants argue that the agreements operate as an absolute
restraint on trade, "restricting any conceivable activity that
might impair a former employer's interests."  Def.'s Supp. Mem.
at 25.  Defendants also contend that customers should have the
capacity to choose freely among business providers, and that the
agreements prevent customers from so doing.  *Id.*  "[T]he public
has an interest in the enforcement of reasonable restrictive
covenants."  *Intelus*, 7 F. Supp. 2d at 642.  As the Court has
determined that the agreements appear reasonable and enforceable,
it is therefore not against public policy for the Court to
enforce them.

b.  Tortious Interference with Contract Claim

To establish HRH's tortious interference with Wachovia's
contracts with Hinds and Barsoum, Wachovia must demonstrate: (1)

a contract between Wachovia and a third party; (2) HRH's
knowledge of that contract; (3) HRH's intentional interference
with that contract; (4) breach of that contract by the third
party; and (5) resulting damages to the plaintiff. *Fowler v.
Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (Md.
Ct. Spec. App. 1991).  As discussed above, the agreements appear
to be valid and enforceable, and restrict Hinds and Barsoum from
causing customers of Wachovia with whom they worked to move to
HRH.  There is some evidence that Hinds and Barsoum breached
their covenants, and may have caused financial and other injury
to Wachovia.  To succeed on their claim, Wachovia must show that
HRH intentionally interfered with Wachovia's contracts with Hinds
and Barsoum.

To prove intentional interference with an employment
contract, the new employer need not have knowledge of the
employee's restrictive covenant at hiring.  *Id.* at 469, 598 A.2d
at 804.  Rather, the primary inquiry is whether, "upon learning
of the restrictive covenant that binds its new employee, the new
employer nevertheless 'engages the employee to work for him in an
activity that would mean violation of the contract not to
compete.'" *Id.* (*citing* Restatement (Second) of Torts § 768 cmt.
i. (1979)).  It is no defense that the new employer thought the
restrictive covenant was invalid or unenforceable.  *Id.* at 467
n.6, 598 A.2d at 803 n.6.

On July 30, 2007, Meacham contacted HRH to inform it that Hinds was in breach of her nonpiracy agreement.  Meacham Aff. ¶ 41.  Michael Murphy, the President of HRH's Baltimore office, indicated that HRH's legal department had reviewed the nonpiracy agreement and believed that it was not a violation of the agreement if Wachovia customers made the initial contact with Hinds.  *Id.*  On August 1 and August 3, Hinds conducted presentations for HRH to the DC Law Firm Consortium and the Atlanta Law Firm Consortium, and on August 7 to Arent Fox.[5]  HRH was aware of Hinds's and Barsoum's activities on these dates and appears to have capitalized on the breach of the agreements.  Accordingly, Wachovia has a significant likelihood of prevailing on its intentional interference with contract claim.

c.   Civil Conspiracy Claim

A civil conspiracy under Maryland law consists of "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff."  *Hoffman v. Stamper*, 385 Md. 1, 24, 867 A.2d 276, 290 (Md. 2005) (*quoting Green v. Wash. Suburban Sanitation Comm'n*, 259 Md. 206, 221, 269 A.2d 815, 824 (Md. 1970)).  The plaintiff must also establish that an overt act

---

[5] Barsoum also helped with these presentations. Hr'g Tr. 40, 53, 60.

in furtherance of the agreement caused the injury.  *Id.* at 25, 867 A.2d at 290.  Furthermore, "[i]t is well settled that if a covenantor associates with others in a conspiracy to violate his covenant, his conduct entitles the covenantee to recover against the conspirators any damages he has sustained resulting from the breach."  *Checket-Columbia Co. v. Lipman*, 201 Md. 494, 503, 94 A.2d 433, 437 (Md. 1953); *see also Ancora Capital & Mgmt. Group, LLC v. Corp. Mailing Servs., Inc.*, 214 F. Supp. 2d 493, 500 (D. Md. 2002) (agreements between employer and employee to violate restrictive covenant employee signed with former employer may result in liability for civil conspiracy).

As of the July 30, 2007 conversation between Meacham and Murphy, it is apparent that HRH knew of the Hinds and Barsoum Agreements, and was on notice that Wachovia believed that Hinds had breached her agreement.  HRH permitted Hinds and Barsoum to use its resources to give presentations to the DC Law Firm Consortium on August 1, a telephone conference with the Atlanta Law Firm Consortium on August 3, and a presentation to Arent Fox on August 7.  As a result of these overt acts, Wachovia has lost the significant revenues of the Atlanta Consortium and Arent Fox and is in danger of losing the DC Consortium as well.  Although these activities are not illegal, Wachovia has a significant likelihood of prevailing on its claim of civil conspiracy.

5.   Public Interest

     The public interest prong has been equated with preserving the status quo until the merits can be fully considered by the trial court.  *Maryland Undercoating*, 603 F.2d at 481.  Defendants contend that granting Wachovia's motion will impair the ability of employees to compete in the marketplace and provide services to the public.  Wachovia counters that the public interest weighs in favor of enforcing contractual obligations and preventing employers from interfering with existing employment agreements. The Court has determined that the balance of harms and the likelihood of success on the merits weighs heavily in favor of Wachovia.  Therefore, it is within the public interest to preserve the status quo and grant Wachovia's motion for a preliminary injunction.

III. Conclusion

     For the reasons stated above, Wachovia's motion for a preliminary injunction was granted and Defendants' motion to dissolve the TRO was denied.

August 30, 2007                         _____/s/_____
Date                                    William D. Quarles, Jr.
                                        United States District Judge